# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

DONALD A. TOWNSON,

        Plaintiff,

    vs.                    **Case No. 09-4106-RDR**

MICHAEL J. ASTRUE,
Commissioner of Social
Security,
        Defendant.

---

## MEMORANDUM AND ORDER

On August 29, 2006, plaintiff filed applications for social security disability insurance benefits and supplemental security income benefits. These applications alleged a disability onset date of July 11, 2005. On January 27, 2009, a hearing was conducted upon these applications. The administrative law judge (ALJ) considered the evidence and decided on February 25, 2009 that plaintiff was not qualified to receive benefits on either application. The Appeals Council refused to review the ALJ's decision which was then adopted by defendant. This case is now before the court upon plaintiff's motion to review the decision to deny plaintiff's applications for benefits.

## I. STANDARD OF REVIEW

To qualify for disability benefits, a claimant must establish that he is "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E). This means proving that the claimant is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." § 423(d)(1)(A). But, disability benefits can only be awarded to claimants who can show that they were disabled prior to the last insured date. §§ 423(a)(1)(A) & 423(c).

For supplemental security income claims, a claimant becomes eligible in the first month where he is both disabled and has an application on file. 20 C.F.R. §§ 416.202-03, 416.330, 416.335.

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards. Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004). "Substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id., quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)). The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to

the court de novo.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II.  THE ALJ'S DECISION (Tr. 8-26).

The ALJ made the following findings in her decision.  She decided that plaintiff met the insured status requirements of the Social Security Act through September 30, 2008.  (Tr. 22).  She found that plaintiff has not engaged in substantial gainful activity since July 11, 2005.  (Tr. 23).  She further found that plaintiff has two "severe" impairments:  status post left knee surgery and sacroiliac pain.  (Tr. 23).  The ALJ considered evidence that plaintiff suffers from depression, but decided that when plaintiff was compliant with treatment, he had no severe mental impairment.  (Tr. 23).  The ALJ determined that plaintiff does not have an impairment or combination of impairments that meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  She decided that plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except for work requiring occasional climbing, kneeling, crouching and crawling and frequent balancing and stooping.  (Tr. 23).  The ALJ found that plaintiff is unable to perform any past relevant work.  (Tr. 24).  But, considering plaintiff's age, education, work experience and RFC, the ALJ concluded that plaintiff can perform jobs that exist in

significant numbers in the national economy.  (Tr. 25).

III.  ARGUMENTS AND ANALYSIS

    A.  <u>Plaintiff's depression - Dr. Sheafor</u>

Plaintiff argues that the ALJ erred by failing to find that plaintiff's depression was severe and violated Social Security regulations by failing to consider the impact of plaintiff's depression upon his ability to work.  These contentions involve the opinions and medical records of Dr. Sheafor, plaintiff's mental health provider.

We reject both parts of this argument.  Regarding the latter part, the ALJ engaged in a lengthy discussion of Dr. Sheafor's records.  The ALJ did not fail to consider the impact of plaintiff's depression upon his ability to work.  Plaintiff simply disagrees with the result of the ALJ's consideration.  As for the first part of the argument, defendant contends and plaintiff does not dispute, that once an ALJ finds a severe impairment <u>of any kind</u>, the failure to find <u>another</u> severe impairment is not reversible error as long as the ALJ properly considered all of plaintiff's impairments in combination to determine plaintiff's RFC.  See <u>Brescia v. Astrue</u>, 287 Fed.Appx. 626, 628-29 (10th Cir. July 8, 2008); <u>Parise v. Astrue</u>, 2009 WL 3764119 at *3 (D.Kan. Nov. 10, 2009).  Because the ALJ found severe impairments other than depression in this case, the failure to consider plaintiff's depression as severe is not reversible error.  Thus, the issue

4

boils down to whether the ALJ <u>properly</u> considered all of the evidence, including the evidence of plaintiff's depression, in determining plaintiff's RFC. This issue consumes the bulk of plaintiff's argumentation which the court shall proceed to consider.

The ALJ made the following conclusions regarding plaintiff's mental health:

> I find that the claimant has not, for any continuous period of 12 months, had any limitations of daily living or in concentration, persistence, and pace from his mental impairment, he had a mild limitation in social functioning, and no episodes of decompensation. Thus, when the claimant was compliant with treatment, he had a good response to treatment and he had no severe mental impairment or combination of mental impairments that more than minimally limited his ability to perform basic work activities.

(Tr. 18). These findings are in accord with a November 1, 2006 psychiatric review technique form completed by a nonexamining doctor, Dr. Warrender (Tr. 303-15), and confirmed upon review by Dr. Witt. (Tr. 391). The ALJ's findings are not in accord with plaintiff's treating psychiatrist, Dr. Sheafor.

Plaintiff contends that the ALJ failed to follow the correct legal standards and provide proper weight to Dr. Sheafor's opinions. Plaintiff notes, among many arguments, that the ALJ criticized Dr. Sheafor's "check off form" while choosing to rely upon a similar form by a non-examining physician.

Generally, treating sources are given more weight than non-treating sources and examining sources are given more weight than

non-examining sources.  20 C.F.R. § 404.1527(d)(1)&(2).  The Tenth

Circuit said in McGoffin v. Barnhart, 288 F.3d 1248, 1253 (10th Cir.

2002) that it has "long held that 'findings of a nontreating

physician based upon limited contact and examination are of suspect

reliability.'"  Quoting Frey v. Bowen, 816 F.2d 508, 515 (10th Cir.

1987).  The Tenth Circuit has described the gradation of authority

accorded to medical opinions as follows:

> The opinions of physicians who have seen a claimant over
> a period of time for purposes of treatment are given more
> weight over the views of consulting physicians or those
> who only review the medical records and never examine the
> claimant.   The treating physician's opinion is given
> particular weight because of his unique perspective to
> the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of
> individual examinations, such as consultative exam-
> inations or brief hospitalizations.   The opinion of an
> examining physician is generally entitled to less weight
> than that of a treating physician, and the opinion of an
> agency physician who has never seen the claimant is
> entitled to the least weight.

Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004) (interior

citations and quotations omitted).

Dr. Sheafor's "check off form" was labeled a "mental

impairment questionnaire." Dr. Sheafor completed the questionnaire

on January 21, 2009, more than two years after Dr. Warrender's

psychiatric review technique form and Dr. Witt's review of that

form.  Dr. Sheafor indicated that plaintiff suffered from major

depression which was chronic and severe and assessed plaintiff's

GAF as 45.[1] (Tr. 521). He listed plaintiff's symptoms as: mood disturbance; anhedonia or pervasive loss of interests; social withdrawal or isolation; decreased energy; feelings of guilt/worthlessness; difficulty thinking or concentrating; and irritability. (Tr. 521-22). He described plaintiff was walking slowly and painfully; as appearing slow; and as being discouraged by his inability to work or to find pain relief. (Tr. 522). He indicated that plaintiff's condition had improved a little with medication and listed no side effects from the medication. (Tr. 522). Dr. Sheafor stated that plaintiff's pain and disability causes his depression which in turn increases the suffering from his pain. (Tr. 523). He estimated that plaintiff's depression would cause plaintiff to be absent from work more than three times a month. He reported that plaintiff had poor ability or no ability: to maintain regular attendance and be punctual within customary, usually strict tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 524-5). He explained that plaintiff had problems with poor concentration,

---

[1] "A GAF score of 41-50 indicates . . . serious impairment in social occupation, or school functioning, such as inability to keep a job." Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (interior quotation omitted).

irritability, mood instability and that he was unable to perform regularly. (Tr. 524). He indicated that plaintiff had "mild" restrictions of activities of daily living; "moderate" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation, each of extended duration.

The ALJ's primary criticism of Dr. Sheafor's mental impairment questionnaire is that it is not supported by or is inconsistent with the information in Dr. Sheafor's treatment notes. The court has reviewed those notes.

On January 16, 2006, plaintiff first saw Dr. Sheafor. Plaintiff complained of insomnia. He was tearful and discouraged. He had had family difficulties and was worried about his inability to find a job. Dr. Sheafor diagnosed plaintiff with "major depression, single episode, severe, situational." (Tr. 296). He prescribed medication. On March 1, 2006, Dr. Sheafor noted that plaintiff's depression was up and down. He also noted anxiety and insomnia. He increased plaintiff's medication. On March 22, 2006, Dr. Sheafor noted that plaintiff was discouraged and depressed because he did not have a job. (Tr. 294). Plaintiff seemed a bit hopeless and suffered from restless sleep. On April 10, 2006, Dr. Sheafor noted a "good early response" to medication. (Tr. 295). Plaintiff seemed less angry and coped better with his ailments. (Tr. 295). On May 24, 2006, plaintiff still complained of restless

sleep. (Tr. 292). On July 27, 2006, plaintiff reported that he had run out of medication. Dr. Sheafor noted that plaintiff had more depression and social isolation. (Tr. 293). On September 13, 2006, Dr. Sheafor recorded that plaintiff was not doing well. Plaintiff was depressed, discouraged and still suffered from insomnia. He noted that plaintiff's pain was "continuous." (Tr. 291). On October 17, 2006, Dr. Sheafor stated that plaintiff was "about the same," although medications helped. (Tr. 290). On December 19, 2006, Dr. Sheafor noted that plaintiff was "more depressed." He stated that plaintiff suffered from anhedonia, irritability, anorexia, and insomnia. He indicated that plaintiff needed to take a larger dose of Effexor. (Tr. 519). On January 25, 2007, Dr. Sheafor noted a positive response to the increased medication. Plaintiff seemed less depressed and less irritable. But, he was still "anorexic" and still had sleeping problems. (Tr. 518). On March 28, 2007, Dr. Sheafor noted that plaintiff's depression was "well-controlled" with Effexor, but that "persistent pain" kept plaintiff awake. (Tr. 517). On August 27, 2007, Dr. Sheafor reported that plaintiff was more irritable and still had problems sleeping. (Tr. 516). On October 9, 2007, Dr. Sheafor said that plaintiff was "a little better emotionally." (Tr. 515). He indicated that plaintiff was sleeping well, except for pain and that plaintiff's medications were helping his mental condition. On April 2, 2008, Dr. Sheafor reported that plaintiff's medications

were doing "all we can expect." (Tr. 514). He said that plaintiff's pain was "constant and at times intolerable." (Tr. 514). He felt that plaintiff's depression was mainly related to plaintiff's pain and lack of relief. On August 1, 2008, Dr. Sheafor said that plaintiff's pain was not well-controlled, but a bit better. He also noted that plaintiff suffered from fatigue and felt more depressed. (Tr. 513). On January 7, 2009, Dr. Sheafor reported that plaintiff walked painfully with a cane. He stated that plaintiff was still quite irritable, impatient and avoided people. Plaintiff and Dr. Sheafor seemed to feel that the medications were working as well as could be hoped. (Tr. 513).

Contrary to the ALJ, we find that Dr. Sheafor's questionnaire is consistent with his treatment notes. All of the symptoms listed in the mental health questionnaire are mentioned in Dr. Sheafor's treatment notes, with the possible exception of difficulty thinking or concentrating which arguably is related to anxiety.

The ALJ also asserted that the severity of plaintiff's depression as described by Dr. Sheafor in the questionnaire is not consistent with the treatment notes. The ALJ may have reached this conclusion because the ALJ overstated the degree of depression found by Dr. Sheafor. The ALJ repeatedly characterized Dr. Sheafor's questionnaire as stating that plaintiff was non-functional or nearly non-functional in almost every area of mental functioning. (Tr. 16-17). We do not read Dr. Sheafor's mental

impairment questionnaire as taking this position.  Of the 25
categories of mental abilities and aptitudes listed on the form,
Dr. Sheafor graded plaintiff as "poor" in only five, and one of
those categories was related to plaintiff's physical, not mental,
impairments.  Nor is there any other document from Dr. Sheafor
which contends that plaintiff was mentally non-functional or nearly
so.  The ALJ's overstatement of this matter does not mean that Dr.
Sheafor's form must be considered controlling, but it does suggest
that the ALJ improperly dismissed the form as making an
unsubstantiated claim.

The ALJ also discounted the conclusions in Dr. Sheafor's
mental impairment questionnaire because the treatment notes show
that plaintiff received conservative treatment over a period of
years and demonstrated a good response to the medications he was
prescribed for his depression.  This analysis appears proper, at
least on its face.  A treating source's opinion should be
considered in the context of the nature and extent of the treatment
relationship, including the treatment provided and the kind of
examination or testing performed.  <u>Watkins v. Barnhart</u>, 350 F.3d
1297, 1300 (10th Cir. 2003) (listing factors).

However, the ALJ improperly speculated that the reason for
less aggressive treatment was that plaintiff's depression was not
severe or was adequately controlled.  The ALJ could have clarified
the record by questioning Dr. Sheafor, but she did not do so.  See

20 C.F.R. § 404.1512(e)(1).  An alternative explanation for the course of treatment is that Dr. Sheafor believed that plaintiff's pain and disability caused his depression and other forms of treatment would not address plaintiff's pain and disability.  The alternatives mentioned by the ALJ do not seem to address or mitigate plaintiff's pain and disability.[2]

The ALJ heavily discounted Dr. Sheafor's references to plaintiff's pain.

> The treatment record shows that the doctor never performed a physical examination, nor did he ever perform x-rays, MRIs, CT scans, etc.  Thus, there is no evidence from that doctor to corroborate the severe degenerative disease of both hips he claims the claimant has.  Also, the records do not show that he treats the claimant's pain, that he has reviewed the treatment records of the doctors who treat the pain or that he had a medical conference with the doctors who treat the claimant's pain.  Thus, the statements he makes about the claimant's level of pain, response to pain treatment and the physical limitations are nothing more than a recordation of what the claimant tells him.

(Tr. 17).  While it is proper to consider the medical evidence (or lack thereof) in support of Dr. Sheafor's conclusions, including the lack of evidence to support a degenerative disease causing hip pain, the ALJ goes too far in dismissing Dr. Sheafor's conclusions completely.  First, as plaintiff's counsel notes, contrary to the ALJ's remarks, Dr. Sheafor did examine medical records which were

---

[2] The ALJ listed these examples of more aggressive mental health treatment: more frequent visits; intensive one-on-one therapy; inpatient hospitalization; placement in a day treatment program; and placement in a sheltered living environment. (Tr. 18).

provided to him.  (Tr. 387).  Second, as discussed later in this opinion, some of the objective tests in this case did support a diagnosis of hip dysfunction.  Third, Social Security regulations indicate that the Commissioner will consider the opinion of a nontreating source regarding a claimant's pain, but will give it less weight than the opinion of a treating source.  20 C.F.R. § 404.1527(d)(2)(ii).  Fourth, Dr. Sheafor may arguably be considered a treating source for plaintiff's pain.  The psychological component of plaintiff's pain appears to have been the original reason for referring plaintiff to Dr. Sheafor.  Finally, "[d]epression, diagnosed by a medical professional, is objective medical evidence of pain to the same extent as an x-ray film." Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998).  As Dr. Sheafor stated, plaintiff's depression increased his suffering from pain. (Tr. 523).  Dr. Sheafor was qualified to determine the psychological impact of plaintiff's alleged pain.  However, the ALJ appeared to give little consideration and no weight to Dr. Sheafor's opinion regarding plaintiff's pain.  Instead, the ALJ credited the opinion of sources who did not examine plaintiff at all.

The ALJ denigrates the "check off form" completed by Dr. Sheafor suggesting that it was motivated solely to obtain disability benefits for plaintiff.  (Tr. 18).  This suggestion is merely speculation and an improper reason to reject Dr. Sheafor's

conclusion. See <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1121 (10th Cir. 2004) (rejecting an ALJ's criticism that a treating physician's opinion was given as "an act of courtesy" for a claimant); see also, <u>McGoffin</u>, 288 F.3d at 1252 (an ALJ may not reject a treating physician's opinion on the basis of his or her own credibility judgment, speculation or lay opinion).

The ALJ also refused to give weight to Dr. Sheafor's mental impairment questionnaire because it relied upon plaintiff's "subjective complaints and self assessed functional limitations," when the ALJ found these complaints and statements unbelievable. (Tr. 18). It must be remembered however, that the practice of psychology requires the evaluation of subjective complaints. <u>Miranda v. Barnhart</u>, 205 Fed.Appx. 638, 641 (10th Cir. 2005). "There is no 'dipstick' test for disabling depression." <u>Schwarz v. Barnhart</u>, 70 Fed.Appx. 512, 518 (10th Cir. 7/16/2003). It requires an assessment of subjective complaints. <u>Id</u>. This is understood in the Social Security regulations. <u>Robinson</u>, 366 F.3d at 1083 (citing 20 C.F.R. Subpart P, App.1 § 12.00(B) (a psychological assessment may rely upon "observed signs and symptoms <u>or</u> on psychological tests") (emphasis added)). In this instance, the ALJ improperly substituted her lay opinion of plaintiff's "signs and symptoms" for that of Dr. Sheafor.[3]

_____

[3] Defense counsel also cites <u>Hayes v. Callahan</u>, 976 F.Supp. 1391, 1395 (D.Kan. 1997) which holds that an ALJ may "reject [a] treating physician's opinion if the physician's records reflect

B.  Drs. Frye and Penn

Dr. Frye is a medical doctor.  Dr. Penn is a chiropractor.[4]
Both men treated plaintiff over a considerable period of time.
Plaintiff contends that the ALJ improperly evaluated the opinions
of these medical sources.

On January 26, 2009, each doctor signed a form labeled
"Medical Opinion Re: Ability To Do Work-Related Activities." (Tr.
533-36).  This form indicated that plaintiff could lift 10 pounds
on an occasional basis and less than 10 pounds on a frequent basis.
It listed plaintiff as being able to stand and walk for about two
hours and to sit with legs elevated for about two hours in an
eight-hour day.  The form shows that plaintiff must change position
frequently to relieve discomfort; sit for 15 minutes; stand for
five minutes; and walk every 30 minutes for five minutes at a time.
The form states that plaintiff must lie down at unpredictable

---

only the plaintiff's subjective beliefs regarding his disability,
if office records do not support the physician's conclusions, or if
the physician's treatment records do not support the physician's
conclusion." (Citations omitted).  The conditions listed for
rejecting a treating physician's opinion do not exist on this
record with regard to Dr. Sheafor.  For the same reasons, as
discussed later in this opinion, the Hayes decision does not
justify the ALJ's rejection of Dr. Frye's and Dr. Penn's opinions.

[4] Defendant notes and plaintiff concedes that Dr. Penn's
opinions are not entitled to "controlling weight" under Social
Security Regulations because Dr. Penn is a chiropractor.  See St.
Clair v. Apfel, 2000 WL 663958 at *4 (10th Cir. 5/22/2000).  But Dr.
Penn's opinions should still be considered in determining the
severity of plaintiff's impairments and plaintiff's RFC.  20 C.F.R.
§§ 404.1513(d) and 416.913(d).

intervals during a work shift for about ten minutes once a day. According to the form, plaintiff should never stoop, crouch, climb stairs or climb ladders, and that plaintiff should only occasionally twist. It indicates that plaintiff's ability to reach, handle and push or pull is affected by his impairment, and that there are limits on his kneeling, balancing and crawling. The form states that plaintiff should avoid all exposure to extreme cold, extreme heat, wetness and hazards, such as machinery and heights. Finally, it estimates that on average plaintiff's impairments would cause him to be absent from work more than three times a month. Drs. Frye and Penn attributed plaintiff's impairments to his left knee ACL damage, chronic left sacroiliac joint and left hip pain, and depression.

The ALJ gave little or no weight to this form even though it derived from plaintiff's treating sources. She found that plaintiff could lift and carry up to 10 pounds frequently and 20 pounds occasionally, stand or walk or sit for six hours of an eight-hour workday, and perform occasional climbing, kneeling, crouching and crawling and frequent balancing and stooping. (Tr. 15). The ALJ did not make a finding as to how often plaintiff might need to switch positions to relieve discomfort.

The ALJ disregarded the "check off disability form" from Drs. Frye and Penn because she did not believe it was supported by the treatment notes of those gentlemen or by the other medical evidence

in the record. The court disagrees with this assessment, particularly as it relates to left sacroiliac or left hip pain. The court shall review the medical records with some emphasis on that area. First, the court shall discuss the medical records from doctors other than Dr. Frye and Dr. Penn.

As background to this discussion, the court would note that plaintiff's last job involved working with heavy tires as a tire technician. Plaintiff suffered a left knee injury at work which led to ACL reconstruction surgery in July 2003. He was released to work on light duty in late August 2003. He thought that he reinjured the knee after he returned to work, but was told that he could again return to work in December 2003.

**Dr. Sandow - December 2003.** Plaintiff was examined by Dr. Sandow in December 2003. Plaintiff complained of left buttocks and leg pain and low back pain which prevented him from doing his job and significantly limited other activities. (Tr. 411). But, he was not taking pain killers. (Tr. 411). He was walking with a limp and complained that he could not walk for more than a block or stand for long periods of time. (Tr. 410). He was unable to squat, kneel or run. (Tr. 410).

Upon examination in December 2003, Dr. Sandow found no tenderness over the sacroiliac joint, sciatic notches or nerves. (Tr. 412). He found that plaintiff could not stand on his left toes or heel. Plaintiff's range of motion in his lumbar spine was

100% limited in forward flexion and extension and lateral flexion were limited 75%.  There was a positive left straight leg raising at 45 degrees with a positive Lasegue test and negative left fabere test.[5]  There was muscle weakness in the left quadriceps, left hamstrings, and left ankle.  Dr. Sandow found significant atrophy and weakness of both the left thigh and the left calf.  (Tr. 413).  He found that plaintiff's "back, left buttocks and left leg symptoms also suggest nerve impingement in the lumbar spine."  (Tr. 413).  He suggested that these symptoms were a natural consequence of plaintiff's left knee injury and abnormal gait since that injury.

**Dr. Jones – August/September 2004.**  Plaintiff was examined by Dr. Jones in August and September of 2004.  He complained that in May 2004 he developed a very sharp pain in his lower back that extended down his left leg after he attempted to lift a heavy tire.[6]  (Tr. 444).  Plaintiff stated that since that time he has

---

[5] The court assumes that a "fabere" test is a test of flexion, adduction and external rotation used to gauge sciatic symptoms.

[6] This seems to correspond with plaintiff's testimony before the ALJ that:
> On my second injury, I was . . . standing in the shop and this older gentleman pulled his truck in there and had a large tractor tire in the back of it.  And he was standing right beside the tractor tire, and as the tire started to flip over on top of him and I jumped in the way to try to push it out of the way, and I tore my hip up, and that's how my hip and my lower back got messed up.

(Tr. 39).

had persistent pain in the buttocks and down his left leg. A physical examination showed tenderness to any palpation around the knee and left leg. Plaintiff could flex his knee which was stable. But, he had a "lot of tenderness in the posterior buttocks and his left SI joint is very exquisitely tender." (Tr. 444). His lumbar spine motion was "very limited" because of the pain in plaintiff's left SI joint. (Tr. 444). Dr. Jones diagnosed plaintiff with a "quite significant" strain of his left SI joint with radicular pain. He also observed "considerable weakness" and "severe atrophy" during his left lower extremity examination. (Tr. 445). Dr. Jones suggested treatment to plaintiff's SI joint. He commented that:

> I would not have [plaintiff] do any kneeling, squatting, climbing or crawling activity. He really can't even sit for long periods of time. He could stand and sit intermittently, but I don't believe he could tolerate 8 hours of changing positions.

(Tr. 445).

Dr. Jones saw plaintiff four weeks later in late September 2004, after plaintiff had been received care from a chiropractor. He indicated that plaintiff's symptoms and strength were significantly improved, but that plaintiff continued to have radicular-type leg pain. He said that plaintiff still could not squat and that he still could not tolerate standing or sitting eight hours a day. (Tr. 442).

**Dr. Welch - October 2004.** In October 2004, plaintiff was

19

evaluated by Dr. Welch for left hip and lower extremity pain. (Tr. 396). Dr. Welch found no disc herniation or spinal stenosis. Plaintiff was not taking prescription medication.

**Dr. Sandow - March 2005.** Plaintiff was examined by Dr. Sandow a second time in March 2005. At the time of the examination, plaintiff was still working as a tire technician. He complained to Dr. Sandow of constant left leg and hip pain. (Tr. 404). He said he could not run. (Tr. 403). He was taking Tylenol for sleep. He complained that he could not sit or stand for more than one hour. (Tr. 404-05). From a physical examination, Dr. Sandow found no tenderness over the sacroiliac joints or sciatic notches or nerves. (Tr. 405). Plaintiff was unable to stand on his left toes or left heel. There were limits in the range of motion of plaintiff's lumbar spine. There were positive straight leg raising, Lasegue and fabere tests on plaintiff's left leg. Dr. Sandow diagnosed chronic lumbosacral strain with radiculopathy, in addition to plaintiff's knee reconstruction. (Tr. 406). He said plaintiff should avoid repetitive bending, stooping, twisting, squatting, kneeling or crawling. He estimated that plaintiff could lift 42 pounds occasionally and 22 pounds frequently. He also said plaintiff should avoid ladder climbing. (Tr. 406).

**Dr. Veloor - October 2006.** In October 2006, plaintiff was evaluated by Dr. Veloor. This was more than a year after plaintiff had stopped working and after plaintiff's July 11, 2005 alleged

date of disability. Dr. Veloor noted that plaintiff had had MRIs of the lumbar spine which were essentially normal and an EMG nerve conduction study by Dr. Welch which was also normal. (Tr. 299). She noted that plaintiff had had chiropractic treatment and SI joint injections for his SI joint and that he had had cortisone injections into his left piriformis muscle (which involves the sciatic nerve and is near the sacroiliac joint). This treatment had provided uneven relief. Dr. Veloor stated that plaintiff's pain "apparently starts in the left buttock and it usually is triggered by walking, standing for too long, or lifting activities. It radiates down the left leg and also radiates into the low back." (Tr. 299). Plaintiff indicated that he took some pain medication off and on. Upon physical examination, Dr. Veloor found that there was tenderness along the left piriformis muscles; a positive straight leg test on the left side; and a positive Patrick's sign for both sides of plaintiff's hips. (Tr. 300). She also noted that plaintiff avoided putting weight on his left leg. Plaintiff had normal strength in both lower extremities and was able to stand on his toes and heels. Dr. Veloor diagnosed plaintiff with left piriformis syndrome; left SI joint dysfunction; and status post left knee reconstruction. (Tr. 300). She recommended a trial of botulium toxin injections. Plaintiff later reported that Dr. Veloor gave him a cane. (Tr. 426).

**Dr. Vosburgh - May/June 2008.** Dr. Vosburgh saw plaintiff in

May and June of 2008. The record indicates that plaintiff was seeing Dr. Vosburgh specifically for his left knee. Plaintiff said he had been using a cane for the last seven or eight months, although he did not know whether it was necessitated by instability of his knee or the pain about his hip. (Tr. 530). Dr. Vosburgh found little or no evidence of left knee instability or degenerative changes. During the June 2008 examination, Dr. Vosburgh continued to find little or no objective evidence of knee instability. He also found no limitations of range of motion at the hip and determined that x-rays of plaintiff's pelvis and left hip were normal. He diagnosed plaintiff with left hip and buttock pain and recommended that plaintiff follow up with Dr. Frye for treatment of that pain.[7] (Tr. 528).

**Dr. Penn.** Plaintiff visited Dr. Penn several times beginning in August 2004. Dr. Penn noted in September 2004 that his evaluation "clearly demonstrate[d] lumbopelvic muscle imbalance and intervertebral and sacroiliac joint movement restriction." (Tr. 363). A treatment program commenced. In October 2004, Dr. Penn indicated that plaintiff had made "consistent improvements in the strength and flexibility of his left knee and lumbosacral spine." (Tr. 361). Plaintiff did not see Dr. Penn again until July 2005.

---

[7] Dr. Vosburgh also diagnosed plaintiff with "subjective instability, left knee, status post ACL reconstruction." (Tr. 528). Contrary to the ALJ's account (Tr. 13), Dr. Vosburgh did not diagnose plaintiff with "subjective" left hip and buttock pain.

Plaintiff reported increased symptoms after a period of work where he "'did 20 semi tires in five hours.'" (Tr. 360). In August 2005, Dr. Penn noted that plaintiff was progressing slowly, complained of soreness and trouble sleeping, and was taking medication for pain to assist with sleeping. (Tr. 359). Dr. Penn indicated that some psychological counseling and consultation with Dr. Frye would be helpful. (Tr. 357).

In November 2005, Dr. Penn referred to improvement in plaintiff's condition, although he stated that plaintiff was still very depressed because he had been unable to return to work. (Tr. 354).

**Dr. Frye.** Plaintiff visited Dr. Frye many times starting about August 2005. At that time, Dr. Frye prescribed pain medication which plaintiff later reported had given him good relief. (Tr. 355). Dr. Frye conducted a physical examination and noted in December 2005 that plaintiff's range of motion was "mildly" restricted; that plaintiff favored his left leg; that plaintiff had normal strength, though some atrophy of the left thigh and calf; and that with palpation plaintiff experienced tenderness moderately severe over the left SI joint. (Tr. 353). An injection for the SI joint was suggested.

Dr. Frye commented in May 2006 that plaintiff was having pain along the low back and tenderness in the sacroiliac joints bilaterally. Dr. Frye also noted left piriformis pain and

tenderness.  He remarked that an injection in December 2005 had provided relief for over a month and a second set of injections would be attempted.  (Tr. 348).  In May 2006, after some more injections, Dr. Frye noted "very significant left buttock pain" for which plaintiff received some hydrocodone.  (Tr. 347).  He commented that examination showed "only mild tenderness over both SI joints but moderate tenderness and hypertonicity over the left piriformis.  He noted that plaintiff's hip moved normally without significant discomfort.  Dr. Frye felt plaintiff had had a good response to the SI injections.  Another injection was administered later in May 2006 because plaintiff was having ongoing pain in the left piriformis area.  (Tr. 346).

In September 2006, Dr. Frye noted that plaintiff had ongoing pain in the left buttock, although he had an excellent response to his previous left piriformis injection.  Plans for another such injection were made.  (Tr. 329).

Dr. Frye conducted another examination in April 2008.  (Tr. 436-37).  Plaintiff complained of left leg, low back and hip pain. He said the pain radiated from his low back down the legs. Plaintiff said the pain was worse with prolonged sitting, standing, walking or lying down.  Plaintiff assessed the pain as a 9 on a 10 point scale.  However, plaintiff was not taking pain medications at that time.  Dr. Frye observed that plaintiff limped on his left leg.  His range of motion was restricted.  There was a positive

"Faber's test" and tenderness over both greater trochanters, the left SI joint and the left piriformis.[8]  Plaintiff had normal strength but could only do a half squat.  Dr. Frye considered more injections for "sacroilitis, piriformis syndrome and greater trochanter bursitis" and hydrocodone for pain.  The injections were later given and plaintiff experienced a "good deal of improvement." (Tr. 434).  But, he complained of hip pain on April 18, 2008 and Dr. Frye found that both hips "have dysfunction on examination with pain in the groin."  (Tr. 433).  Dr. Frye set plaintiff up for manipulation to the hips three times a week for two weeks and hydrocodone for pain.

In July 2008, plaintiff indicated that his pain was about 6 out of 10 at first in the morning and that he does better in the day, but had difficulty sleeping at night.  Dr. Frye noted mild to moderate pain or discomfort with motion and mild to moderate tenderness over both SI joints and mild tenderness over the greater trochanters.  He commented that plaintiff was tolerating his pain level "quite well", taking hydrocodone only occasionally.  (Tr. 430).

Plaintiff returned to Dr. Frye in November 2008 complaining of increasing left sacroiliac and hip pain which significantly limited him in walking.  Examination showed tenderness over the left greater trochanter and left SI joint.  More injections were done.

_____

[8] We assume the Faber's test is the same as the fabere's test.

(Tr. 429).

In December 2008, plaintiff reported moderate relief from the injections.  He was also using hydrocodone at one or less a day. (Tr. 428).

**Analysis of the ALJ's consideration of Drs. Frye and Penn's opinions.**  Contrary to the ALJ's conclusion, the medical records offer fairly consistent objective evidence of a painful condition related to plaintiff's sacroiliac joint or piriformis muscle.  Over a three or four-year period, the records show consistently positive Lasegue, Fabere, and Patrick's sign tests on plaintiff's left side. There were also consistent, although often mild, limitations in plaintiff's range of motion in the hip area.  Tenderness to palpation was often noted during physician examinations. Injections and manipulative treatment were prescribed for the pain. X-rays and MRIs did not demonstrate the condition.  But, there is no indication that x-rays or MRIs would be a definitive diagnostic tool for plaintiff's condition.

The ALJ rejects the check-off form from Drs. Frye and Penn as "nothing more than a recordation of the [plaintiff's] assertions." (Tr. 15).  This is speculation, however.  No evidentiary basis is cited from the ALJ's conclusion.  The court has already referenced Tenth Circuit case law for the proposition that an ALJ may not rely upon speculation or lay opinion to contradict the judgment of a treating physician.  Langley, 373 F.3d at 1121; McGoffin, 288 F.3d

26

at 1252.

The ALJ argues that there is no objective evidence to support the specific limitations mentioned in the check-off form, such as the limits for lifting or carrying weight and the estimate for missed workdays. The ALJ does not describe the kind of objective evidence which the ALJ expected to see to support such limits. Obviously, the ALJ gave more weight to different limits assessed by the non-examining consultant (and reviewed by a non-examining physician) who analyzed the same medical records (up to November 2006) and reached a different result. The ALJ does not describe in any detail the objective evidence which supports those limits but contradicts the limits listed by Drs. Frye and Penn.

The ALJ suggested that the check-off form is not consistent with evidence that "[t]he doctors found that the claimant had a greater functional capacity when they evaluated his condition for Workers' Compensation purposes." (Tr. 15). But, the ALJ does not identify these evaluations with any specificity. The ALJ may be referring to the Workers' Compensation evaluation by Dr. Sandow (not Dr. Frye or Dr. Penn) in March 2005 where Dr. Sandow indicated that plaintiff could lift 42 pounds occasionally and 22 pounds frequently and that plaintiff had a 37 percent permanent partial impairment of the left lower extremity and a 15 percent permanent partial impairment of the body as a whole. (Tr. 406). There is no indication that Dr. Frye ever endorsed these estimates. While Dr.

Penn never adopted the lifting limitations suggested by Dr. Sandow, he did state in August 2005 that he concurred with Dr. Sandow's ratings of 37% permanent partial impairment of the lower extremity and 15% permanent partial impairment of the body as a whole. (Tr. 357). However, Dr. Penn stated in the same letter that plaintiff was unable to work due to his increased pain and that plaintiff was getting worse.

The ALJ may also be referring to a statement she incorrectly attributed to Dr. Frye earlier in the administrative opinion.[9] The ALJ said that Dr. Frye stated that plaintiff "would be able to manage the 50-60-pound tires." (Tr. 11). Dr. Frye did not make this comment. Dr. Penn came the closest to making that statement and what Dr. Penn <u>actually</u> said was:

> I would like to continue working with Mr. Townson at a frequency of once or twice a week for another month. Our focus would be on further developing his strength and coordination to allow him to safely return to full duty. At this point, I am not sure that he will be able to get back to lifting the largest truck tires, but I expect he will be able to manage the 50-60 lb. passenger tires.

(Tr. 361). Obviously, Dr. Penn did not say that plaintiff could manage 50 to 60-pound tires. Rather, this was the <u>goal</u> of Dr. Penn's program to improve plaintiff's work capacity. Dr. Penn made

---

[9] The Commissioner makes citation to this statement when remarking that "Plaintiff's providers found he had greater functional capacity when they evaluated his condition for workers compensation determinations." Doc. No. 20 at p. 10. The Commissioner also refers to two documents from Dr. Sandow, who did not provide treatment to plaintiff.

this statement in October 2004 which is before plaintiff's alleged date of disability, and plaintiff did return to his job until July 2005. So, perhaps plaintiff did reach the goal of Dr. Penn's program. But, eventually plaintiff returned to Dr. Penn complaining in July 2005 of increasing symptoms after an intensive period of work with "semi tires." (Tr. 360). At that point, Dr. Penn's examination indicated "worsening lumbar radiculopathy." (Tr. 360). Plaintiff did not work thereafter.

The ALJ also stated that the objective medical record did not show a material deterioration in plaintiff's condition after the worker's compensation evaluations. (Tr. 15). However, as already noted, in August 2005 Dr. Penn said that plaintiff was unable to work and getting worse from a physical and emotional standpoint, and he referred plaintiff to Dr. Frye and eventually Dr. Sheafor. Dr. Penn further stated in October 2005 that plaintiff was getting worse and should not return to work until he demonstrated adequate improvement to return to work. (Tr. 356). Dr. Penn wrote a letter in July 2006 which indicated that plaintiff had improved since starting treatment with Dr. Sheafor. (Tr. 345). However, the letter does not indicate that plaintiff had improved so much that he could return to employment – – only that continued treatment and medication would greatly increase plaintiff's chance of doing so. Dr. Frye's records indicate improvement <u>and</u> deterioration in plaintiff's condition, depending on when plaintiff received

injections from Dr. Frye.

The court has already reviewed the objective evidence of the pain producing conditions as well as the psychological component of depression. Drs. Frye and Penn treated plaintiff over several years. There were <u>numerous</u> visits to each doctor (except in 2007) with the goal of improving plaintiff's condition so that plaintiff could return to work. The doctors administered multiple examinations, physical therapy, injections for pain, and prescription medication. They also reviewed the records of other doctors who examined plaintiff. Contrary to the ALJ, the court believes there is objective evidence to support Drs. Frye and Penn's opinion regarding the limits upon plaintiff's RFC.

C. <u>Credibility</u>

Plaintiff argues that the ALJ's credibility determinations are not supported by the record. Plaintiff does not contend that the ALJ failed to apply the proper standards, only that the ALJ made a credibility judgment on the basis of matters which are contrary to the record.

Plaintiff testified on January 27, 2009 that he has pain after sitting or standing for very long "and it just gets me to where I get real nervous, and I just hurt all the time." (Tr. 33). He said:

> I have to just move around and, you know, I'll sit for 15 minutes or so and then I have to stand up for a little while. Then I have to just move. And if it gets too bad, I have to just go in there and lay in the hot tub

and soak until I relieve the pain a little bit. (Tr. 34). Plaintiff testified that he had injections which help with the pain for about a month. (Tr. 33). He takes other medication which, he stated, causes the side effects of dizziness, fatigue and some memory or concentration problems. (Tr 33). Plaintiff testified that his activities are mostly confined to watching TV. He cannot do hobbies, rarely visits with friends and very seldom goes out or travels. (Tr. 37). He said that he can bathe and dress himself with some difficulty and that he tries to help with household chores, but lots of times he can't do it. (Tr. 36). He stated that he can go to the store and drive with difficulty. (Tr. 36-37).

A third-party report, dated November 10, 2006, was filed by plaintiff's friend. (Tr. 157-164). According to this report, plaintiff has stayed home most of the time since he was injured at work and mostly watches TV. On bad days, plaintiff lays down most of the day. He does little walking because of the pain. Sometimes pain makes plaintiff irritable and he does not want to visit with friends. Pain disturbs his sleep, his appetite and his appearance. Plaintiff's girlfriend does most of the cleaning in plaintiff's small apartment as well as the grocery shopping. He said that plaintiff was depressed that he could not work. He also indicated that plaintiff's medications make him drowsy and sometimes plaintiff is sick in his stomach.

The ALJ concluded that plaintiff's testimony was not credible for the following reasons:  1) plaintiff's complaints are out of proportion to the objective clinical findings and observed functional restrictions - for example, there is no evidence of severe disuse muscle atrophy or evidence that plaintiff is mentally non-functional; 2) the complaints are inconsistent with the level of treatment plaintiff receives, in other words, if plaintiff were as disabled as he claims, he would have received more aggressive treatment from his doctors; 3) plaintiff's description of his activities of daily living in testimony before the ALJ are inconsistent with plaintiff's pre-hearing statement; and 4) the third-party statement from plaintiff's friend is not consistent with the medical records. (Tr. 19-20).

The court believes plaintiff's criticism of the ALJ's credibility analysis is largely correct.  The ALJ implicitly acknowledges a consistency between the reports of Drs. Frye, Penn and Sheafor and the complaints and testimony of plaintiff.  Indeed, the ALJ claims that the reports of these doctors merely rehash plaintiff's complaints.  The ALJ also acknowledges that plaintiff suffers from physical conditions which are capable of producing pain and that plaintiff has received various treatments and medications for pain.  The ALJ argues that there are no objective findings in the record which support the extent of pain and disability which plaintiff claims.  But, the ALJ does not specify

the sort of objective findings which she believes would be essential to support plaintiff's credibility, except to the following extent. The ALJ refers to: the absence of severe disuse muscle atrophy; that plaintiff has not been prescribed a cane/crutch/walker/wheelchair as a medical necessity; that plaintiff has not been told to lie down or elevate his legs; and that plaintiff does not need a caretaker because of any mental impairment. The court does not believe the absence of any of these findings detracts from plaintiff's credibility. Plaintiff complains and the record suggests that plaintiff cannot sit or stand for a sustained period without needing to change positions because of pain; he also complains the pain makes sleeping, among other things, difficult. The fact that he does not have severe disuse muscle atrophy (although there is a record of some atrophy) or that he must have a cane/crutch/walker/wheelchair (although he has used a cane) or that he has not been told to lie down and elevate his legs (although he has done that to relieve pain), does not appear to detract from the credibility of plaintiff's complaints that he suffers from pain which makes maintaining a single position difficult. As for any claimed mental impairment, plaintiff's testimony and complaints have never suggested that he needed a caretaker. Therefore, his credibility should not be doubted because of the absence of a caretaker or the recommendation for a caretaker.

The court agrees with plaintiff that, contrary to the ALJ, the activities of daily living form which plaintiff filled out in 2006 is not significantly different from plaintiff's testimony before the ALJ in 2009. Plaintiff wrote in 2006 that he did "cleaning and laundry" for about an hour or so in 2006. (Tr. 140). This is not substantially different from his statement that "I try to do as much [household chores] as I can, but lots of times I . . . can't." (Tr. 36). In 2006, plaintiff listed "fishing, football [and] hunting" as hobbies. (Tr. 142). Perhaps plaintiff meant watching football on TV because "watching TV" is listed as an example of a hobby on the form.[10] He said that he did these activities "once every 2 months maybe" and that since his injuries he was limited because it hurt too much to stand or bend for any period of time. (Tr 142). He also said, "It hurts me to do physical things." This does not seem substantially different from plaintiff's claim before the ALJ that he cannot do his hobbies anymore. (Tr. 37).

The court also finds that the ALJ's credibility determination is not supported by her analysis of the third-party statement. The third-party statement was supportive of plaintiff's testimony. But, the ALJ discredited the third-party statement because it was not "consistent with medical records." (Tr. 20). The third-party

_____

[10] However, Dr. Sandow indicated in December 2003 (before the alleged date of disability) that plaintiff told him that for recreation plaintiff currently played football, fishes and hunts. (Tr. 411). As noted previously, in March 2005, plaintiff told Dr. Sandow that he could not run.

statement was not making a judgment regarding whether there was an objective basis for the existence or extent of plaintiff's pain. The third-party statement merely corroborates plaintiff's claim that his activities are rather minimal and that plaintiff complains to others about pain. Therefore, while the ALJ may always consider plaintiff's credibility in light of the medical record, inconsistency with the medical record is not a reason to reject the third-party statement out of hand.

Finally, the ALJ legitimately considered plaintiff's levels of medication and efforts to obtain pain relief. The treatment notes in this case show that there were times when plaintiff was not using pain medication or was using little or much pain medication. The notes also show that plaintiff received some relief without side effects from pain medication or injections. Nevertheless, as plaintiff's counsel notes, the record also shows that plaintiff often contacted his doctors for assistance with pain relief and consistently followed the doctors' advice. Therefore, on this record, it is speculative for the ALJ to "assume that if claimant were as disabled as he claims, his doctors would have ordered more aggressive treatment." (Tr. 19). This comment assumes that plaintiff's doctors disbelieved plaintiff's pain complaints, when the record does not show that they did.

IV. CONCLUSION

Medical and treating sources who dealt with plaintiff numerous

times from mid-2004 to the beginning of 2009 have filled out forms in 2009 which are strongly supportive of plaintiff's claims in this matter.    The ALJ has discounted these forms and credited other forms filled out in 2006 by non-examining doctors and consultants, who rendered opinions regarding plaintiff's RFC based upon medical records which the ALJ said contained inadequate objective findings for making such judgments.   The ALJ bases her decision largely on the purported absence of objective medical findings to support plaintiff's alleged extent of pain and disability.    The ALJ contends that the doctors upon whom plaintiff relies filled out their forms by parroting plaintiff's subjective complaints which the ALJ disbelieves again because of the absence of objective medical findings to support those complaints.

There is objective medical evidence that plaintiff has a pain-producing condition in the hip region and that plaintiff has depression.  Both of these conditions supply an objective nexus to plaintiff's subjective complaints of pain.    While the ALJ discredits the evidentiary support for plaintiff's claim that the pain is disabling, the court finds that this analysis is legally improper for the following reasons.   First, it is based upon speculation that plaintiff's treating sources merely restated plaintiff's subjective complaints when rendering an opinion regarding plaintiff's physical and mental capacity.  Second, it assumed or speculated that plaintiff's treating sources did not

believe plaintiff's subjective complaints of pain or otherwise they would have ordered more aggressive types of treatment. Third, it is based upon lay opinion or speculation that different or more aggressive types of treatment would have been effective. All of these matters may have been clarified had the ALJ made additional contact with plaintiff's treating sources. Fourth, the ALJ's analysis improperly discredited the objective evidence of depression as diagnosed from claimant's signs and symptoms. Fifth, it improperly dismissed out of hand the opinion of an alleged non-treating source (Dr. Sheafor) regarding plaintiff's pain. Sixth, the ALJ did not convincingly or specifically describe the kind of essential but missing objective evidence which the ALJ believed was necessary to substantiate plaintiff's complaints of pain. Finally, although the ALJ legitimately considered matters in the treatment notes such as the level and effectiveness of medication, the ALJ also inaccurately recounted the record and overemphasized inconsistencies to attack the opinions of plaintiff's treating sources and to support her conclusion that plaintiff's claims were not credible. All of these flaws in the ALJ's analysis may have had an impact upon the ALJ's determination of plaintiff's RFC.

On the basis of these and other points described in this order, the court shall reverse and remand the decision to deny benefits in this case for further proceedings consistent with this opinion. This judgment and remand shall be entered in accordance

with the fourth sentence of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Dated this 25th day of May, 2010 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge